IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MARI S. SANDOVAL                                                                                    PLAINTIFF

VS.                                              CIVIL NO. 05-5193

JO ANNE B. BARNHART, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                                DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Mari Sandoval, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") terminating her child disability benefits under the provisions of Title XVI of the Social Security Act (hereinafter the "Act").

**Procedural Background:**

The application for child disability benefits now before this court was filed on plaintiff's behalf on November 24, 1992, by her grandmother.[1] (Tr. 66-71). Plaintiff was found to be disabled at the initial determination level due to emotional problems and learning disabilities, with an onset date of November 1, 1992. (Tr. 88). Following a continuing disability review, however, plaintiff's disability was found to have ceased as of May 1, 1997. (Tr. 151-155). This determination was affirmed by a disability hearing officer in May 1998. (Tr. 166-172). Pursuant to plaintiff's request, an administrative hearing was then held on July 9, 1999. (Tr. 43-65). However, on July 28, 1999, the Administrative Law Judge ("ALJ") also concluded that plaintiff's disability had ceased as of May 1, 1997. (Tr. 8-19). On appeal, this court reversed the ALJ's decision and remanded the case for further evaluation under the new childhood disability standard, effective January 2, 2001. (Tr. 391-397). A supplemental hearing was then held on April 22, 2004. (Tr. 447-497). Plaintiff was present and

---

[1] However, at the time of the filing of this appeal, plaintiff was eighteen-years-old.

represented by counsel. At the time of the supplemental administrative hearing, plaintiff was seventeen-years-old and enrolled in the eleventh grade. (Tr. 382).

On June 17, 2004, the ALJ issued a written decision finding that plaintiff's anxiety disorder not otherwise specified, attention deficit hyperactivity disorder ("ADHD"), and psychotic disorder were severe impairments that did not meet or functionally equal the severity of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 382). He also concluded that plaintiff did not have an "extreme" limitation in any domain of functioning or a "marked" limitation in two domains of functioning. Accordingly, the ALJ again determined that plaintiff's disability ceased as of May 1, 1997. (Tr. 382).

On October 4, 2005, the Appeals Council declined to review this decision. (Tr. 354-356). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided

the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

A determination that a child is disabled requires a three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. See 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a medically determinable impairment(s) that is severe. *See* 20 C.F.R. § 416.924(c)). A severe impairment is an impairment that is more than a slight abnormality or a combination of slight abnormalities that causes more than a minimal functional limitation. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *See* 20 C.F.R. § 416. 924(d).

Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d)(1).

In the present case, the ALJ entered his decision in July of 1999. The Appeals Council entered its decision in May of 2001. (Tr. 3-4). During the period between the ALJ's decision and the Appeals Council's decision, the Commissioner amended the functional equivalency regulations in § 416.926a. These amendments became effective January 2, 2001, marking a major change in the evaluation process employed by ALJ's in child disability cases. Under the current law, to determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's ability to function in his or her activities in terms of six domains. These domains are broad areas of functioning intended to capture all of what a child can or cannot do. The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. 20 C.F.R. § 416.924a(b)(1)(I)-(vi).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to a disability in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is an impairment that "interferes seriously with your ability to independently initiate, sustain, or complete activities." It also means "more than moderate" but "less than extreme." *See* 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation exists when the impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. "Extreme" limitation also means a limitation that is more than marked, and is the rating given to the worst limitations. *See* 20 C.F.R. § 416.926a(c)(3)(ii).

**Discussion:**

In the present case, the ALJ found that plaintiff's claim failed at step three, as she did not have an impairment that met or medically or functionally equaled a listed impairment. Functional equivalence may be established by demonstrating marked limitations in two, or extreme limitations in one of the following areas: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. *See* 20 C.F.R. § 416.92a (d).

Of particular concern to the undersigned is the ALJ's conclusion that plaintiff had less than marked limitations in the area of acquiring and using information. We note that I.Q. testing in September 1992 revealed that plaintiff was functioning within the borderline range of intellectual functioning. (Tr. 307, 308).

Further, on December 17, 1996, and February 14, 1997, plaintiff was evaluated by a team of psychological examiners at Schmieding Development Center. (Tr. 312). I.Q. testing at this time revealed an I.Q. in the average range of intellectual functioning. (Tr. 314). However, evaluators reconciled this with her previous score, stating that the previous test, the WISC-3, was based heavily on verbal ability. The examiners maintained that the motor-free nonverbal intelligence score obtained by the current test was accurate, in light of plaintiff's delays in language and probable delays in visual motor and fine motor development. (Tr. 314). As such, the team concluded that plaintiff had a significant language based learning disability, a developmental motor coordination disorder characterized by dysgraphia (difficulty writing), a moderate developmental language disorder, and adjustment disorder with anxious and depressed mood. (Tr. 317). She was also found

5

to have significant attention deficit disorder, of the primarily inattentive type, that appeared to exist in addition to her learning problems and apart from her emotional adjustment difficulties. (Tr. 317).

Between January 1997 and March 15, 1997, plaintiff's accelerated reader reports indicate that she was reading on a second grade level. (Tr. 253). At this time, plaintiff was in the fourth grade. Between March 1997 and May 30, 1997, records indicate that plaintiff continued to read on a second grade level. (Tr. 248). These low scores continued into plaintiff's fifth grade year. (Tr. 236, 244).

In October 1997, plaintiff scored at the third grade level on the standardized test for assessment of reading ("S.T.A.R."), although she was in the fifth grade at this time. (Tr. 243). This placed her within the eleventh percentile in reading. (Tr. 243).

Although plaintiff met her accelerated reader goal of fifteen books in May 1998, a progress report card revealed that she had only a sixty-eight percent comprehension rate. (Tr. 232). As such, her teachers recommended that she read daily with an adult. (Tr. 233).

An individualized education program ("IEP") dated May 28, 1998, revealed that plaintiff was enrolled in special education courses for reading, written expression, spelling, and math. (Tr. 211-223). She was noted to receive instruction in reading/written expression through "inclusion." (Tr. 212). Progress notes show that plaintiff completed regular classroom work with modifications and service from her resource teacher. Records indicate that math was her strength, although she was only able to read on a third grade level and spell on a second grade level. Plaintiff was said to have difficulty with comprehension skills, especially vocabulary and context clues. Her decoding skills were also noted to be weak, especially when dealing with multi-syllable words. Plaintiff also experienced difficulties with sentence structure and mechanics, spelling, writing paragraphs in logical order and editing her own work. (Tr. 212).

In May 1999, plaintiff was enrolled in special education reading, English, and learning strategies courses for the 1999-2000 school year. (Tr. 340). Her reading skills remained below grade level. (Tr. 341). Further, plaintiff continued to require modifications, supplemental aids, and supports in science, social studies, math, and reading. (Tr. 347-350).

On February 19, 2002, plaintiff underwent a second evaluation at Schmieding Development Center. (Tr. 398-407). I. Q. testing revealed a full scale I. Q. of seventy-five, which fell within the borderline deficient to low average range. (Tr. 402). Further testing revealed poor organization and attention skills that contributed to a relative weakness in applied mathematics. (Tr. 404). Visual-motor integration skills were significantly discrepant from her nonverbal intellectual abilities and were developed to borderline deficient levels. A slightly impaired performance was noted with regard to fine motor speed and coordination in the left dominant hand. Although her testing results were not highly suggestive of attention problems, given her history, the psychological evaluators concluded that her previous diagnosis of attention-deficit/hyperactivity disorder was warranted. (Tr. 405). They also noted that plaintiff was experiencing significant difficulties related to anxiety. Accordingly, she was diagnosed with anxiety disorder not otherwise specified, ADHD, developmental motor coordination disorder/dysgraphia, history of moderate language delay, and obsessive/compulsive features. The examiners concluded that plaintiff would learn best with teaching approaches based on oral instruction. (Tr. 405).

Because these evaluations and records show that plaintiff was suffering from borderline intellectual functioning and experiencing significant learning disabilities, we do not find that substantial evidence supports the ALJ's conclusion that plaintiff had less than marked limitations

in this area of functioning.² According, we believe that remand is necessary to allow the ALJ to develop the record further with regard to plaintiff's ability to acquire and use information.

We also note that the only RFC assessment contained in the file was completed by a non-examining, consultative physician. Therefore, on remand, the ALJ should request that plaintiff's treating physician complete a childhood disability assessment form. (Tr. 418-422). This will provide the ALJ with a more in depth view of plaintiff's learning abilities and disabilities.

The ALJ also concluded that plaintiff had less than marked limitations in the area of attending and completing tasks. (Tr. 380). However, we note that the psychological evaluation conducted in December 1996 and February 1997 indicated that plaintiff was suffering with "significant" attention deficit disorder. (Tr. 317).

On April 10, 1997, Ellen Taylor, plaintiff's fourth grade teacher completed a school questionnaire. (Tr. 206-208). Ms. Taylor reported that plaintiff experienced problems concentrating on class work, working independently or staying on task, and completing assignments on task to the extent that it interfered with plaintiff's academic and/or social progress. (Tr. 206-208).

In May 1998, an IEP also revealed that plaintiff was "distractable" and "scattered" all of the time, which interfered with her ability to complete tasks. (Tr. 212). It was determined that plaintiff should receive 450 minutes per week of remedial instruction in this area. (Tr. 226-227). In addition, the teachers provided plaintiff with assignment sheets, extra time to complete her work, reduced

---

²The undersigned notes that there is some evidence in the record to suggest that plaintiff's academic abilities may have improved after 2002. However, we question the ALJ's conclusion that plaintiff had less than marked limitations in this area in May 1997, the date he determined that her disability ceased to exist.

assignments, tutoring, peer read materials, preferential seating, and short instructions, in an effort to address her problems. (Tr. 213, 219-222). Her tests were also said to include fewer questions, a word bank, and a reduction in the number of multi-choice options to avoid distractions. (Tr. 220-221). However, in May 1999, plaintiff's teachers noted that she continued to struggle with staying organized and completing assignments consistently. (Tr. 341).

In February 2002 a second psychiatric evaluation performed by Schmeiding revealed that plaintiff was experiencing significant problems with anxiety. (Tr. 406). In fact, following extensive testing and evaluation, the examiners recommended that plaintiff be placed in a class that had daily routines which were generally adhered to on a regular basis. They indicated that she would experience problems adapting to change. As such, it was recommended that plaintiff's teachers notify her parents in advance of any special, non-routine activities, so that they would have plenty of time to prepare plaintiff for the transition. (Tr. 380).

In August 2002, Dr. Linda Shumate, a child and adolescent psychiatrist, diagnosed plaintiff with anxiety disorder and mild ADHD. (Tr. 408). At this time, plaintiff was taking Risperdal, Wellbutrin, and Adderall. Plaintiff's aunt complained that plaintiff was "staring off into space." However, in spite of medication adjustments, progress notes from Schmieding dated between 2003 and 2004 reveal that plaintiff continued to be "spacey" at times. (Tr. 424, 427).

After reviewing this evidence, we do not find substantial evidence to support the ALJ's finding of less than marked limitations in this area. Accordingly, the case will also be remanded for further evaluation of plaintiff's limitations in this domain of functioning. On remand, the ALJ is directed to reevalute the evidence concerning plaintiff's attention deficits.

In addition, the ALJ also found no limitations in the area of moving about and manipulating objects. However, the records indicate that plaintiff was diagnosed with developmental motor coordination disorder, which is a disorder characterized by poor coordination and clumsiness. (Tr. 412). Additionally, in February 2002, the evaluators at Schmeiding concluded that plaintiff had moderately deficient visual-motor integration skills that made handwriting especially cumbersome and frustrating for her. (Tr. 405). It was recommended that plaintiff's curriculum not contain large amounts of written work. Further, plaintiff was noted to have difficulty with rapid alternating movements. (Tr. 413). Given this information, it is clear that the record does not support a finding of no limitations. As such, on remand, the ALJ is directed to develop the record further with regard to plaintiff's ability to move about and manipulate objects. Particular attention should be paid to plaintiff's ability to perform handwritten tasks and rapid movements.

**Conclusion:**

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of September 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE